UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

HAROLD STONE and JOHN WOESTMAN,
for themselves and others similarly-situated, and
UNITED STEEL, PAPER AND FORESTRY,
RUBBER, MANUFACTURING, ENERGY,
ALLIED INDUSTRIAL AND SERVICE      Case No. 17-cv-5360
WORKERS INTERNATIONAL      Class Action
UNION, AFL-CIO-CLC;

     U.S. District Judge _____

     Plaintiffs,


SIGNODE INDUSTRIAL GROUP LLC and
ILLINOIS TOOL WORKS INC., jointly and severally,

     Defendants.
_____/

### COMPLAINT AND JURY DEMAND

1.      Plaintiffs Harold Stone, John Woestman, and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC ("USW") sue defendants Signode Industrial Group LLC ("Signode") and Illinois Tool Works Inc. ("ITW") to enforce collectively-bargained promises of lifetime family healthcare for more than 140 retirees from the now-closed Acme Packaging plant in Riverdale, Illinois (the "Riverdale plant").

**Jurisdiction and Venue**

2.      This Court has jurisdiction to enforce collectively-bargained retiree healthcare promises, and over this action, under **(1)** Labor-Management Relations Act ("LMRA") Section 301, 29 U.S.C §185; **(2)** Employee Retirement Income Security Act ("ERISA") Section 502, 29 U.S.C. §§1132(a)(1)(B), (a)(3), (e) and (f); and **(3)** 28 U.S.C. §§1331 and 1337.

3.     Venue is proper in this district, under 29 U.S.C. §185(a) and 29 U.S.C. §§1132(e)(2) and (f), where **(1)** Signode and ITW are headquartered and do business, **(2)** USW represents employees, **(3)** the Riverdale plant was located, **(4)** healthcare benefits addressed in this lawsuit are, or were, administered and provided by defendants, and **(5)** the breaches and ERISA violations that are the subject of this complaint occurred.

## The Parties

4.     Plaintiff and class representative Harold Stone started working at the Riverdale plant in 1956.  While working at the plant, Stone was in the USW-represented collective bargaining unit. Stone retired after 48 years of service in 2003. He received healthcare from defendants starting at his retirement, until January 2016.  Stone is, or was, a participant in the welfare benefit plan created, sponsored, and operated by defendants to provide healthcare to retirees and to the retirees' spouses, other eligible dependents, and surviving spouses. Stone resides in Dyer, Indiana.

5.     Plaintiff and class representative John Woestman started working at the Riverdale plant in 1968.  While working at the plant, Woestman was in the USW-represented collective bargaining unit.  Woestman retired after 37 years of service in 2004. He and his wife, Susan Woestman, received healthcare from defendants starting at his retirement, until January 2016. Woestman is, or was, a participant in the welfare benefit plan created, sponsored, and operated by defendants to provide healthcare to retirees and to the retirees' spouses, other eligible dependents, and surviving spouses. Susan Woestman is, or was, a beneficiary in that welfare benefit plan. The Woestmans reside in South Holland, Illinois.

6.     Plaintiff USW is a labor union representing workers in industries affecting commerce within the meaning of 29 U.S.C. §§142, 152, and 185. USW is headquartered in

Pittsburgh, Pennsylvania, has offices throughout the United States and Canada, and represents employees in this district. USW represented production and maintenance employees at the Riverdale plant and was a party to labor agreements governing the plant.

7. Defendant ITW is a Fortune 200 manufacturing corporation. ITW's principal place of business and headquarters are at 155 Harlem Avenue, Glenview, Illinois.

8. ITW is an employer engaged in interstate commerce within the meaning of 29 U.S.C. §§142, 152, and 185.

9. Defendant Signode is a manufacturer of industrial packaging machinery, tools, and packaging products. Signode's principal place of business and headquarters are at 3650 West Lake Avenue, Glenview, Illinois.

10. Signode is an employer engaged in interstate commerce within the meaning of 29 U.S.C. §§142, 152, and 185.

11. Signode was a division of ITW from about 1986 until 2014.

12. Signode became a corporate "spin-off" from ITW and became an independent corporate entity in 2014.

**Summary of Facts**

13. During a period of years through and including 2004, USW and ITW (or its predecessor Acme Packaging Corporation) were parties to (**1**) collective bargaining agreements ("Labor Agreements") governing employees at the Riverdale plant and (**2**) collectively-bargained Pensioners' and Surviving Spouses' Health Insurance Agreements ("Pensioners' CBAs") promising company-paid healthcare to eligible Riverdale retirees and to the retirees' spouses, other eligible dependents, and surviving spouses.

**2002 Pensioners' CBA**

14.    The 2002 Pensioners' CBA is the last of the series of Pensioners' CBAs governing Riverdale plant retirees.

15.    The 2002 Pensioners' CBA promises family healthcare to then-current retirees and to later Riverdale retirees.

16.    The 2002 Pensioners' CBA promises family healthcare to Stone, Woestman, and other Riverdale retirees, and to the retirees' spouses, other eligible dependents, and surviving spouses.

17.    The 2002 Pensioners' CBA is not a single document.   Instead, the 2002 Pensioners' CBA consists of three documents:  **(1)** the 1994 Pensioners' CBA (Ex. A), **(2)** the 1994 Program of Insurance Benefits (the "Program," Ex. B), and **(3)** the 2002 Labor Agreement (Ex. C).

18.    The Program is incorporated into the 1994 Pensioners' CBA. (Ex. A, ¶1(c)). The Program specifies promised healthcare benefits, including hospital and outpatient medical treatment, skilled nursing care, physician services, prescription drugs, substance abuse treatment, and vision care.

19.    The 2002 Labor Agreement modifies the 1994 Pensioners' CBA to create the 2002 Pensioners' CBA.  (Ex. C, Part Two, Sec. II.C and Appendices APC-3 and APC-3A).

20.    The 1994 Pensioners' CBA and the pertinent parts of the 2002 Labor Agreement, which together reflect the 2002 Pensioners' CBA terms, are collected in Ex. D.  We cite Ex. D for references to the 2002 Pensioners' CBA, identifying pertinent Bates-stamped page numbers.

21.    The 2002 Pensioners' CBA—in paragraph 6, titled "Continuation of Coverage"—promises retiree healthcare which "shall not" be "terminated or reduced…so long as" the covered

4

individual "remains retired" or "receives" a surviving spouse pension, "notwithstanding the expiration of this Agreement." (Ex. D at A72).

22.     Typically, a covered individual "remains retired," or "receives" a surviving spouse pension, for life.

23.     The 2002 Pensioners' CBA promises healthcare to eligible employees "who retire[d] on or after" November 1, 2001, the 2002 Labor Agreement's effective date. (Ex. D at A102).

24.     The 2002 Pensioners' CBA also promises healthcare to "(approximately 184) pensioners and their surviving spouses (and their eligible dependents)" who "retired prior to November 1, 2001" under earlier Pensioners' CBAs and were "active participants" or eligible to participate under the earlier Pensioners' CBAs. (Ex. D at A102-A103).

**The 1998-2002 Acme bankruptcy**

25.     Acme Packaging owned and operated the Riverdale plant until 2003.

26.     The 2002 Pensioners' CBA was negotiated by USW and Acme Packaging, the predecessor to ITW and Signode.

27.     Acme Packaging was part of the corporate group, including Acme Steel, Acme Metals, and others (the "Acme Group"), which entered Chapter 11 bankruptcy in 1998. *In re Acme Metals Inc., et al.*, no. 98-2179 (Bankr., D. Del.).

28.     As part of the Chapter 11 reorganization, Acme Packaging and USW negotiated the 2002 Labor Agreement. The 2002 Labor Agreement replaced the 1994 Pensioners' CBA, first with the 2001 Pensioners' CBA, and then with the 2002 Pensioners' CBA. (Ex. D at A102-A103).

29.     The 2001 Pensioners' CBA was in effect from November 1, 2001 until December 31, 2001.  (Ex. D at A103).

30.     The 2001 Pensioners' CBA is "identical" to the 1994 Pensioners' CBA except it also promises healthcare to (**1**) employees "who retire on or after" November 1, 2001, including transferees from Acme Steel to Acme Packaging "that completed one (1) year of actual work" at Acme Packaging and (**2**) "those (approximately 184) pensioners and their surviving spouses (and their eligible dependents)" who retired before November 1, 2001 under the 1994 Pensioners' CBA or earlier Pensioners' CBAs.  (Ex. D at A102).

31.     The 2002 Pensioners' CBA has the "same provisions" as the 2001 Pensioners' CBA, except it modified aspects of the retiree healthcare coverage and set the expiration date of the 2002 Pensioners' CBA at February 29, 2004.  (Ex. D at A103, A117-A119).

32.     11 U.S.C. §1114, part of the U.S. Bankruptcy Code, permits modification of vested healthcare for already-vested retirees, subject to specified safeguards, if the bankruptcy court approves.

33.     The Acme Group asked the Bankruptcy Court to approve modifications to the retiree healthcare coverage specified in the 2001 and 2002 Pensioners' CBAs. (Ex. E, February 4, 2002 motion at ¶¶8-9, 13-15, 18, and 21-23).

34.     The Bankruptcy Court granted the motion under 11 U.S.C. §1114(e).  (Ex. F, February 25, 2002 Order at A74-A75).

35.     The Bankruptcy Court approved the 2001 and 2002 Pensioners' CBAs and the requested retiree healthcare modifications. (Ex. F, February 25, 2002 Order at A74-A75).

36.     Acme Packaging emerged from Chapter 11 bankruptcy on November 1, 2002.

**ITW acquires the Riverdale plant**

37. ITW acquired the Riverdale plant from Acme Packaging in October 2003. (Ex. G at 1).

38. ITW assumed Acme Packaging's liabilities and obligations related to the Riverdale plant, including the obligations for Riverdale retiree healthcare.

39. ITW identified Acme Packaging as an "Illinois Tool Works Inc. Company." (Ex. G at 4).

40. ITW recognized its duty to bargain with USW under the National Labor Relations Act, 29 U.S.C. §141 *et seq*., and recognized USW as the collective bargaining representative of the Riverdale production and maintenance unit.

41. ITW assumed the 2002 Labor Agreement and the 2002 Pensioners' CBA.

42. ITW operated the Riverdale plant beginning in 2003.

43. ITW became the administrator and sponsor of the welfare benefit plan that provided family healthcare to Riverdale retirees consistent with the 2002 Pensioners' CBA.

44. ITW provided healthcare to Stone, Woestman, and other Riverdale retirees, and to the retirees' spouses, other eligible dependents, and surviving spouses consistent with the 2002 Pensioners' CBA.

**The plant closing**

45. ITW permanently closed the Riverdale plant in April 2004.

46. ITW officials said that the retiree healthcare provided consistent with the 2002 Pensioners' CBA was vested, that ITW would continue the retiree healthcare after the Riverdale plant closed, and that the healthcare legally could not be unilaterally terminated.

47.     After the Riverdale plant closed in 2004, ITW remained administrator and sponsor of the welfare benefit plan that provided family healthcare to Riverdale retirees.

48.     ITW continued as administrator and sponsor of the welfare benefit plan that provided family healthcare to Riverdale retirees until 2014.

49.     After the Riverdale plant closed in 2004, ITW continued to provide healthcare consistent with the 2002 Pensioners' CBA to Stone, Woestman, and other Riverdale retirees, and to the retirees' spouses, other eligible dependents, and surviving spouses, and did so until 2014.

50.     In 2014, Signode became and began to act as plan administrator and sponsor of the welfare benefit plan that provided family healthcare to Riverdale retirees.

51.     In 2014, Signode started to provide the family healthcare to Riverdale retirees consistent with the 2002 Pensioners' CBA.

**ITW spins-off Signode**

52.     Signode became a corporate "spin-off" from ITW and became an independent corporate entity in 2014.  (Ex. G at 1).

53.     Signode became owner of ITW's assets, and assumed responsibilities for ITW's liabilities and obligations, related to ITW's industrial packing business and the Riverdale plant, including ITW's Riverdale retiree healthcare liabilities and obligations.

54.     Signode acted as plan administer and sponsor of the welfare benefit plan that provided family healthcare for Riverdale retirees and throughout 2014 and 2015 provided healthcare consistent with the 2002 Pensioners' CBA to Stone, Woestman, and other Riverdale retirees and to the retirees' spouses, other eligible dependents, and surviving spouses.   (Ex. G at 1).

55.     Signode filed a 2014 welfare benefit plan report with the U.S. Department of Labor (the "DOL report"). Signode reported that 142 participants were receiving retiree healthcare under the welfare benefit plan that provided family healthcare to Riverdale retirees. Signode identified itself as the plan sponsor and administrator.  Signode reported that the funding of the welfare benefit plan was from Signode's assets.  (Ex. H at A460-A461).

56.     Signode reported the plan name as Program of Hospital/Medical Benefits for Eligible Hourly Pensioners and Surviving Spouses of Acme Packaging Corporation, which Signode abbreviated as "Program of Hospital/Med Bens for Eligible Hrly Pensioners and Surv Sps of Acme PCKG CORP."  (Ex. H at A460).

57.     The Riverdale retirees did not participate in or approve any ITW-Signode action or transaction regarding the Signode "spin-off" and healthcare for the Riverdale retirees.

58.     USW did not participate in or approve any ITW-Signode action or transaction regarding the Signode "spin-off" and healthcare for the Riverdale retirees.

59.     The Riverdale retirees did not release ITW or Signode from their responsibilities, liabilities, and obligations to provide retiree healthcare consistent with the 2002 Pensioners' CBA.

60.     USW did not release ITW or Signode from responsibilities, liabilities, and obligations to provide retiree healthcare consistent with the 2002 Pensioners' CBA.

**Signode terminates retiree healthcare**

61.     Signode wrote to Stone, Woestman, and other Riverdale retirees in September 2015.  Signode announced that the "retiree health care plan currently providing benefits" to Riverdale "retirees and their dependents (including surviving spouses) will be discontinued." Signode announced that the healthcare "**will end January 1, 2016**."  (Ex. I; bold in original).

62. Signode wrote to USW identifying Signode as the plan sponsor of the welfare benefit plant that provided family healthcare to the Riverdale retirees. (Ex. J).

63. Signode wrote that the welfare benefit plan and the 2002 Pensioners' CBA provided "benefits to eligible retired hourly employees and their dependents (including surviving spouses) of the Acme Packaging Corporation's Riverdale, Illinois facility, which permanently closed in 2004." (Ex. J).

64. Signode wrote that it would end all Riverdale retiree healthcare on January 1, 2016. (Ex. J).

65. Signode wrote to Blue Cross/Blue Shield of Illinois regarding "ACME Retiree Health Insurance." Signode wrote to "cancel" family healthcare for all Riverdale retirees "effective January 1, 2016." Signode wrote that it "will no longer be sponsoring retiree health insurance covering medical, prescription and dental." (Ex. K).

66. USW protested Signode's actions, writing that Signode had no right to "unilaterally terminate retiree healthcare benefits." (Ex. L).

67. USW cited the 2002 Pensioners' CBA promise that "notwithstanding expiration" of the 2002 Pensioners' CBA, an individual's healthcare "shall not" be "terminated or reduced…so long as" that individual "remains retired" or "receives" a surviving spouse pension. (Ex. L).

68. The 2002 Pensioners' CBA retiree healthcare promise contains common collectively-bargained steel industry contract language, which has been held by courts in ERISA/LMRA actions to create vested rights to lifetime retiree healthcare and to prohibit unilateral termination of retiree healthcare by employers and plan sponsors and administrators.

**Post-closing course-of-conduct and performance**

69.     For more than 14 years after the 2002 Pensioners' CBA became effective, ITW and Signode, together or separately, provided healthcare consistent with the 2002 Pensioners' CBA to Riverdale retirees and the retirees' spouses, other eligible dependents, and surviving spouses.

70.     For more than 11 years after the Riverdale plant closed and the ITW-USW bargaining relationship ended in 2004, ITW and Signode, together or separately, provided healthcare consistent with the 2002 Pensioners' CBA to Riverdale retirees and the retirees' spouses, other eligible dependents, and surviving spouses.

**Signode ends retiree healthcare**

71.     Signode ended healthcare for Stone, Woestman, and other Riverdale retirees, and for the retirees' spouses, other eligible dependents, and surviving spouses, on January 1, 2016.

72.     Since January 1, 2016, ITW and Signode have not provided healthcare to Riverdale retirees, the retirees' spouses, other eligible dependents, and surviving spouses.

73.     The Riverdale retirees did not consent to termination of their healthcare.

74.     USW did not consent to termination of the Riverdale retiree healthcare.

75.     Signode provided and Bates-stamped attached exhibits A-C, E-F, and H.

**Class Action**

76.     Stone and Woestman bring this ERISA/LMRA action for themselves and on behalf of similarly-situated retirees and the retirees' spouses, other eligible dependents, and surviving spouses under Fed. R. Civ. P. 23(a) and (b)(1) and (b)(2).

77.     The class consists of (**1**) employees who retired under the 2002 Pensioners' CBA or earlier Pensioners' CBAs from the USW-represented unit at the Riverdale plant and who

received, or were or are eligible to receive, company-provided healthcare and **(2)** the retirees'
spouses, other eligible dependents, and surviving spouses who received, or who were or are
eligible to receive, company-provided healthcare.

78.     All class members were, and continue to be, entitled to healthcare under the 2002
Pensioners' CBA.

79.     All class members received, or are eligible for, healthcare provided by ITW under
the 2002 Pensioners' CBA.

80.     All class members received, or are eligible for, healthcare provided by Signode
under the 2002 Pensioners' CBA.

81.      The class includes the 142 participants mentioned in Signode's 2014 DOL report
(Ex. H at A461) and the approximately 184 pensioners and surviving spouses mentioned in the
2002 Pensioners' CBA (Ex. D at A102) and an unknown number of other participants and the
participant's spouses, other eligible dependents, and surviving spouses.

82.     The class totals more than 142 individuals.

83.     The class is so numerous that joinder of all class members is impracticable.

84.     There are questions of law and fact common to the class, including questions about
the lawfulness under ERISA/LMRA of defendants' unilateral termination of collectively-
bargained retiree healthcare.

85.     Stone and Woestman's claims are typical of those of the class, as all the claims
arise under the 2002 Pensioners' CBA and the ERISA-regulated welfare benefit plan and
healthcare program covering Riverdale retirees and the retirees' spouses, other eligible
dependents, and surviving spouses.

86.     Stone and Woestman's claims address CBA breaches and ERISA/LMRA violations which affect and harm all class members.

87.     Stone and Woestman will fairly and adequately protect the class because they have **(1)** the same claims and interests as other members of the class, arising out of the same facts and law and the 2002 Pensioners' CBA and welfare benefit plan; **(2)** retained attorneys knowledgeable and experienced in ERISA/LMRA retiree healthcare class action litigation; and **(3)** joined with and secured the support of USW in their efforts to enforce the collectively-bargained promises of retiree healthcare.

88.     Defendants' termination of healthcare adversely affects all class members so that injunctive and other class-wide relief is appropriate and a class action will avoid the burden, expense, and risks of inconsistent adjudications of individual claims.

## COUNT I–BREACH OF PENSIONERS' CBA

89.     Paragraphs 1-88 are incorporated in this count.

90.     The 2002 Pensioners' CBA is binding on each defendant.

91.     The 2002 Pensioners' CBA creates vested rights to lifetime healthcare for Stone and Woestman and the other class members.

92.     Defendants are obligated by the 2002 Pensioners' CBA to provide lifetime healthcare to Stone and Woestman and the other class members.

93.     Defendants' January 1, 2016 termination of retiree healthcare breached the 2002 Pensioners' CBA.

94.     Defendants terminated retiree healthcare without the consent of the affected retirees and without the consent of USW.

13

95. Defendants wrongfully terminated retiree healthcare without the consent of the affected retirees and without the consent of USW.

96. Defendants' termination of retiree healthcare caused, and continues to cause, damage and harm to Stone, Woestman, other class members, and USW.

97. Defendants are jointly and severally liable to Stone and Woestman, other class members, and USW for termination of retiree healthcare and contract breaches.

## COUNT II–BREACH OF PLAN AND ERISA VIOLATION

98. Paragraphs 1-97 are incorporated in this count.

99. The collectively-bargained promises of retiree healthcare made to Riverdale retirees and their families constitute a welfare benefit plan (the "plan") within the meaning of ERISA, 29 U.S.C. §1002(1).

100. The plan promises company-paid lifetime healthcare to Stone and Woestman, and to other class members.

101. Stone and Woestman and other class members are, or were, participants in, or beneficiaries of, the plan within the meaning of ERISA, 29 U.S.C. §§1002(7) and (8).

102. Under the plan, each retiree's right to company-supported family healthcare vested at the time of retirement and is to continue for that retiree's lifetime and for the lifetime of that retiree's surviving spouse.

103. Each defendant is, or was, a plan sponsor and administrator of the plan within the meaning of 29 U.S.C. §§1002(16)(A) and (B).

104. Defendants terminated retiree healthcare without the consent of the affected retirees and without the consent of USW.

105. Defendants wrongfully terminated the plan without the consent of the affected retirees and without the consent of USW.

106. Defendants' termination of retiree healthcare violated defendants' obligations under ERISA, 29 U.S.C. §§1132(a)(1)(B) and (a).

107. Defendants' termination of retiree healthcare caused, and continues to cause, damage and harm to Stone and Woestman and to other class members.

108. Defendants are jointly and severally liable to Stone and Woestman and to other class members for wrongful termination of healthcare under the plan.

## RELIEF

Plaintiffs ask the Court to:

A.   Certify the class, appoint plaintiffs Stone and Woestman as class representatives, and appoint their counsel as class counsel;

B.   Declare that defendants' termination of retiree healthcare breached the 2002 Pensioners' CBA;

C.   Declare that defendants' termination of retiree healthcare breached the collectively-bargained welfare benefit plan and violated ERISA;

D.   Issue its injunction directing defendants to satisfy their contractual and statutory duties to provide retiree healthcare and to restore and maintain and comply with the welfare benefit plan in effect before January 1, 2016;

E.   Direct defendants to reimburse and "make whole" each plaintiff and class member for all expenses, losses, bills, insurance premiums, injury, anxiety and distress, and other damages and harm caused by termination of retiree healthcare;

F.   Direct defendants to pay interest on all "make whole" damages;

G.   Direct defendants to pay all costs and expenses incurred by plaintiffs, the class, class members, and class counsel in the prosecution of this action;

H.   Direct defendants to pay plaintiffs' and class counsel's attorney fees at market rates as measured by fees in similar ERISA/LMRA litigation;

I.     Direct defendants to pay such other compensatory, punitive, and exemplary damages as may be warranted; and

J.     Award such other relief as may be warranted by law and equity.

/s/Stuart M. Israel
Stuart M. Israel (MI P15359)
John G. Adam (MI P37205)
Legghio & Israel, P.C.
306 South Washington, Suite 600
Royal Oak, MI 48067
(248) 398-5900
israel@legghioisrael.com
jga@legghioisrael.com


Stephen A. Yokich (IL 6181707)
Dowd, Bloch, Bennett, Cervone, Auerbach & Yokich
8 S. Michigan Ave., 19th Floor
Chicago, IL   60603
(312) 372-1361
syokich@laboradvocates.com

Attorneys for Plaintiffs

Antonia Domingo (PA 320594)
Assistant General Counsel
United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC
60 Blvd. of the Allies, 8th Floor
Pittsburgh, PA 15222
(412) 562-2284
adomingo@usw.org

July 21, 2017                Attorney for Plaintiff USW

16

## JURY DEMAND

Plaintiffs request a jury trial on all issues triable by a jury.

/s/Stuart M. Israel
Stuart M. Israel (MI P15359)
John G. Adam (MI P37205)
Legghio & Israel, P.C.
306 South Washington, Suite 600
Royal Oak, MI 48067
(248) 398-5900
israel@legghioisrael.com
jga@legghioisrael.com


Stephen A. Yokich (IL 6181707)
Dowd, Bloch, Bennett, Cervone, Auerbach &
Yokich
8 S. Michigan Ave., 19th Floor
Chicago, IL   60603
(312) 372-1361
syokich@laboradvocates.com

Attorneys for Plaintiffs

Antonia Domingo (PA 320594)
Assistant General Counsel
United Steel, Paper and Forestry, Rubber,
Manufacturing, Energy, Allied Industrial and Service
Workers International Union, AFL-CIO-CLC
60 Blvd. of the Allies, 8th Floor
Pittsburgh, PA 15222
(412) 562-2284
adomingo@usw.org

July 21, 2017                              Attorney for Plaintiff USW