**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| HAROD STONE and JOHN WOESTMAN, ) <br> for themselves and others similarly-situated, and ) <br> UNITED STEEL, PAPER AND FORESTRY, ) <br> RUBBER, MANUFACTURING, ENERGY, ) <br> ALLIED INDUSTRIAL AND SERVICE ) <br> WORKERS INTERNATIONAL UNION, ) <br> AFL-CIO-CLC, ) <br> ) <br> *Plaintiffs*, ) <br> ) <br> v. ) <br> ) <br> SIGNODE INDUSTRIAL GROUP LLC and ) <br> ILLINOIS TOOL WORKS INC., ) <br> ) <br> *Defendants*. ) | No. 1:17-cv-05360 <br><br> Hon. Thomas M. Durkin <br><br> Magistrate Susan E. Cox |

**LOCAL RULE 56.1 STATEMENT OF MATERIAL UNDISPUTED FACTS IN
SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1(a)(3), Signode Industrial Group LLC ("Signode") and Illinois Tool Works Inc. ("ITW") (collectively, "Defendants") submit the following statement of undisputed material facts:

**The Parties**

1. Defendant ITW, a Delaware corporation headquartered in Glenview, Illinois, is one of the world's leading diversified manufacturers of specialized industrial equipment, consumables and related service businesses. Plaintiffs' Complaint ¶ 7 (Dkt. 1-1), attached hereto at Exhibit 1, hereinafter "Compl. ¶ __"; Defendants' Answer to Complaint ¶ 7 (Dkt. 19), attached hereto as Exhibit 2, hereinafter "Answer ¶ __."

2. Defendant Signode, a Delaware limited liability corporation headquartered in Glenview, Illinois, is a manufacturer of industrial packaging machinery, tools and packing products. Compl. ¶ 9; Answer ¶ 9.

3. Plaintiffs Harold Stone and John Woestman are retired hourly employees of Acme Packaging Corporation's now-closed Riverdale, Illinois plant (the "Riverdale Plant"). Compl. ¶¶ 4–5.

4. Plaintiff United Steelworkers of America ("USW"), a labor union headquartered in Pittsburgh, Pennsylvania, represented certain employees at the Riverdale Plant. Compl. ¶ 6; Answer ¶ 6.

5. In that capacity, the USW was a party to certain labor agreements that set certain terms and conditions of employment for bargaining unit employees as specified by the labor agreements' terms. *Id*.

### Jurisdiction and Venue

6. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as Plaintiffs' claims are based on alleged violations of Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 and Sections 502(a)(1)(B), (a)(3), (e) and (f) of the Employee Retirement Income Security Act, 29 U.S.C. §§ 1132(a)(1)(B), (a)(3), (e) & (f). Compl. ¶ 2; Answer ¶ 2.

7. Venue is proper in this district as the Defendants are each headquartered and do business within this district, the Riverdale Plant was located within this district and the USW represents employees in this district. Compl. ¶ 3; Answer ¶ 3.

### Acme Packaging Corporation Agrees To Provide Health Care Benefits To Certain Riverdale Plant Retirees

8. Plaintiffs Stone and Woestman's former employer, Acme Packaging Corporation, was the wholly-owned subsidiary of Acme Metals Incorporated, and the sister subsidiary of Acme

Steel Company. Compl. ¶¶ 4–5; Application to Bankruptcy Court for Order Approving Settlement Agreement ¶ 2, attached hereto as Exhibit 3 (Dkt. 1-6; Exhibit E to Complaint), hereinafter "Motion for Approval of Settlement Agreement."

9. Acme Packaging Corporation was a producer of steel and plastic strapping and strapping tools. Motion for Approval of Settlement Agreement ¶ 2. Acme Packaging Corporation operated four strapping plants, including the Riverdale Plant. *Id*.

10. Acme Packaging Corporation was party to collective bargaining agreements with the USW that covered hourly employees who worked or had worked at Acme Packaging Corporation's facilities, including those Acme Packaging Corporation hourly employees who worked at the Riverdale Plant. *Id*. at 1.

11. On January 1, 1994, Acme Packaging Corporation and the USW entered into a collectively bargained Pensioners' and Surviving Spouses' Health Insurance Agreement ("1994 Agreement"). Compl. ¶ 13; Answer ¶ 13; 1994 Agreement, attached hereto as Exhibit 4 (Dkt. 1-2; Exhibit A to Complaint). The 1994 Agreement provided health care benefits for eligible Acme hourly employees who worked at the Riverdale Plant and retired after September 1, 1993, along with their surviving spouses. *Id*.

12. The 1994 Agreement provided at Section 6:

> 6. Any Pensioner or individual receiving a Surviving Spouse's benefit who shall become covered by the Program established by this Agreement shall not have such coverage terminated or reduced (*except as provided in this Program*) so long as the individual remains retired from the Company or receives a Surviving Spouse's benefit, notwithstanding the expiration of this Agreement, *except as the Company and the Union may agree otherwise*.

1994 Agreement, at 66 ¶ 6 (emphases added).

13. The 1994 Agreement provided at Section 7:

> 7. This Agreement shall become effective as of January 1, 1994 and shall remain in effect until December 31, 1999 and thereafter subject to the right of either party on 120 days written notice served on or after September 1, 1999 to terminate this Agreement.

1994 Agreement, at 67 ¶ 7. The 1994 Agreement does not state that benefits thereunder are "vested." *See generally* 1994 Agreement.

14. The 1994 Program of Insurance Benefits ("Program of Benefits") underlying the 1994 Agreement does not state that benefits are "vested." *See generally* Program of Benefits, attached hereto as Exhibit 5 (Dkt. 1-3; Exhibit B to Complaint).

15. Section 1.67 of the Program of Benefits underlying the 1994 Agreement states:

> If you or one of your dependents is totally disabled *when coverage for health care benefits terminates* for any reason and you are not eligible for the hospital and medical coverage for pensioners and surviving spouses pursuant to paragraphs 1.27 and 1.29, Health Care Benefits are payable solely with respect to Other Covered Medical Expenses incurred for the illness or injury which caused the total disability. *Health Care Benefits will be payable during the uninterrupted continuance of such total disability, as if coverage for Health Care Benefits has not terminated, but not beyond one year from the date such coverage terminates*.

*Id*. § 1.67 (emphasis added).

16. Other sections of the Program of Benefits underlying the 1994 Agreement, including Section 1.4, Section 2.8, and Section 3.1, also make reference to the "termination" of benefits coverage. *Id*. §§ 1.4, 2.8, 3.1.

### Acme Packaging Corporation Files For Bankruptcy and Reaches a Settlement Agreement with the USW

17. On September 28, 1998, Acme Packaging Corporation and other related Acme entities filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Motion for Approval of Settlement Agreement, at 1. During the pendency of these proceedings, Acme Packaging Corporation continued to operate its many businesses, including the Riverdale Plant. *Id*. ¶ 1.

-4-

18. As part of the Chapter 11 reorganization, Acme Packaging Corporation and the USW negotiated and executed a settlement agreement on January 26, 2002 (hereinafter, the "Settlement Agreement"). Motion for Approval of Settlement Agreement, at 1 and Ex. A.

19. Pursuant to the Settlement Agreement, the 1994 Agreement was terminated, effective October 31, 2001. Motion for Approval of Settlement Agreement, Ex. A, at 6. In its place, the Settlement Agreement established a new November 1, 2001 Pensioners' and Surviving Spouses' Health Insurance Agreement ("2001 Agreement"). *Id.*

20. The Settlement Agreement provided that the 2001 Agreement would be terminated on December 31, 2001, and would be replaced by a new Pensioners' and Surviving Spouses' Health Insurance Agreement dated January 1, 2002 ("2002 Agreement"). Motion for Approval of Settlement Agreement, Ex. A, at 7.

21. The 2002 Agreement was identical to the 1994 Agreement, except for certain specified changes. *Id.* The changed terms in the 2002 Agreement were set forth in Appendix APC-3 of the Settlement Agreement, which included changes to deductibles, network coverage, out-of-pocket limits, out-of-area provisions, and drug co-payments. *Id.*; Motion for Approval of Settlement Agreement, Ex. A, App. APC-3, at 1.

22. Additionally, the 2002 Agreement contained a new durational clause and plan termination provision, which provided that the 2002 Agreement "shall remain in effect until February 29, 2004, thereafter subject to the right of either party on one hundred and twenty (120) days written notice served on or after November 1, 2003 to terminate the 'Pensioners' and Surviving Spouses' Health Insurance Agreement.'" Motion for Approval of Settlement Agreement, Ex. A, at 7. The 2002 Agreement does not state that benefits thereunder are "vested." *See generally* Motion for Approval of Settlement Agreement, Ex. A.

23. On February 25, 2002, the Bankruptcy Court approved the Settlement Agreement. Bankruptcy Court Order, attached hereto as Exhibit 6 (Dkt. 1-7; Exhibit F to Complaint).

24. In its Order, the Bankruptcy Court expressly authorized Acme Packaging Corporation "to modify or terminate the retiree benefits as specifically provided for in the [Settlement] Agreement." *Id*. at 2.

### ITW Acquires Acme Packaging Corporation

25. Acme Packaging Corporation emerged from bankruptcy on November 1, 2002 and thereafter continued to provide retirees health insurance benefits without exercising its termination option. Compl. ¶ 36; January 29, 2016 Signode Letter to USW, attached hereto as Exhibit 7 (Dkt. 1-8; Exhibit G to Complaint), at 1. In October of 2003, ITW acquired Acme Packaging Corporation's assets, including the Riverdale Plant. Compl. ¶¶ 37, 42; Answer ¶¶ 37, 42, 44; 2016 Signode Letter to USW, at 1.

26. Pursuant to the acquisition, ITW recognized USW as the bargaining representative for Riverdale bargaining unit employees and assumed responsibility for various Acme Packaging Corporation benefit plans, including the 2002 Agreement. Compl. ¶¶ 38, 103; Answer ¶¶ 38, 40–41, 43–44, 103; January 29, 2016 Signode Letter to USW, at 1.

27. In addition, ITW and USW extended the then-existing labor agreement for six months through April 30, 2004. January 29, 2016 Signode Letter to USW, at 1.

28. Thereafter, ITW announced the permanent closure of the Riverdale plant and engaged in collective bargaining negotiations with the USW concerning the effects of the closure on the current and retired employees of the facility. Declaration of Marlene Skwarski ¶ 8, attached hereto at Exhibit 8, hereinafter "Skwarski Decl. ¶ __" or "Skwarski Decl. ¶ __and Ex. __." This

bargaining culminated in an April 2004 Memorandum of Agreement concerning the closure ("Riverdale Plant Closing MOA"). Skwarski Decl. ¶ 9.

29. The Riverdale Plant Closing MOA "cover[ed] the terms and conditions of a safe and orderly shutdown," including by extending the collective bargaining agreement then in effect until 11:59 p.m. on the last day worked by bargaining unit employees in the shipping and receiving department at the Riverdale Plant. Skwarski Decl., Ex. A at 1, ¶ 1.

30. The Riverdale Plant Closing MOA also stated, *inter alia*:

> The Union accepts this Agreement as the full and final settlement of any and all claims on behalf of the Union and in full satisfaction of any legal obligation of the Company to bargain over the decision to close the Plant, the closure of same, the relocation of the work, the effects of the decision to close, and any other obligation arising under the National Labor Relations Act or the Collective Bargaining Agreement.

Skwarski Decl., Ex. A ¶ 9.

31. On April 30, 2004, in accordance with the Riverdale Plant Closing MOA, ITW permanently closed the Riverdale Plant. Compl. ¶ 45; Answer ¶ 45; January 29, 2016 Signode Letter to USW, at 1.

32. Following the closure, ITW continued to administer the 2002 Agreement and to provide benefits to eligible participants thereunder until 2014. Compl. ¶¶ 47–49; Answer ¶¶ 47–49.

### ITW Divests Itself of the Signode Business

33. In 2014, ITW divested itself of its signode business, resulting in the formation of Signode Industrial Group, LLC ("Signode") as an independent entity. Answer ¶ 52. Shortly thereafter, Signode was sold to a non-ITW affiliated entity. *Id*.

34. As part of this transaction, Signode assumed responsibility for the ongoing administration and provision of benefits under the 2002 Agreement. Compl. ¶¶ 50–51, 53–56; Answer ¶¶ 50–51, 53–56; January 29, 2016 Signode Letter to USW, at 1.

35. Until January 1, 2016, Signode continued to administer the retiree health care benefits in accordance with the 2002 Agreement. Compl. ¶¶ 53–56, 69–70, 103; Answer ¶¶ 53–56, 69–70, 103; Motion for Approval of Settlement Agreement ¶ 8, Ex. A, at 7.

**Signode Terminates Retiree Health Care Benefits Pursuant to the 2002 Agreement**

36. By written correspondence to the USW on August 31, 2015, Signode announced the termination of retiree health care benefits under the 2002 Agreement. Compl. ¶¶ 62–64; Answer ¶¶ 62–64; August 31, 2015 Signode Letter to USW Regarding Retiree Healthcare Termination, attached hereto as Exhibit 9 (Dkt. 1-11; Exhibit J to Complaint).

37. In compliance with the 120-day notice requirement in the 2002 Agreement, Signode stated that the termination of the retiree health care benefits would be effective January 1, 2016. *Id.*; Motion for Approval of Settlement Agreement ¶ 8, Ex. A, at 7; January 29, 2016 Signode Letter to USW, at 1.

38. On September 1, 2015, Signode notified participants receiving benefits pursuant to the 2002 Agreement that benefits under the Agreement would terminate effective January 1, 2016. Compl. ¶ 61; Answer ¶ 61; September 1, 2015 Signode Letter to Retirees Regarding Healthcare Termination, attached hereto as Exhibit 10 (Dkt. 1-10; Exhibit I to Complaint), at 1.

39. Signode's communications to participants also provided information to assist them in evaluating their potential needs and options for obtaining replacement insurance. Compl. ¶ 61; Answer ¶ 61; 2015 Signode Letter to Retirees Regarding Healthcare Termination, at 1–2.

40. On January 1, 2016, Signode terminated retiree health care benefits under the 2002 Agreement. Compl. ¶¶ 71–72; Answer ¶¶ 71–72.

41. Nearly two years after Signode first notified the Plaintiffs that Signode was terminating retiree health care benefits, Plaintiffs sued Signode and ITW, asserting that "the 2002 [Agreement] creates vested rights to lifetime healthcare" and pointing to the 2002 Agreement's expiration provision—emphasizing the phrase, "shall not have such coverage terminated or reduced." Compl. ¶¶ 21, 91.

42. The 2002 Agreement forms the basis of Plaintiffs' Complaint. Compl. ¶¶ 14–24, 90–94. The Complaint makes no mention of the 2002 Agreement's qualifications that coverage will continue "except as provided in this Program" and "except as the Company and the Union may agree otherwise." *See generally* Compl. The Complaint also never mentions the 2002 Agreement's termination provision. *See generally id*.

Dated: March 15, 2018

    Respectfully submitted,

    SIGNODE INDUSTRIAL GROUP LLC and
    ILLINOIS TOOL WORKS INC.

    By: /s/ Joseph J. Torres
        One of their Attorneys

Joseph J. Torres
Derek G. Barella
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
Tel: (312) 558-5600
Fax: (312) 558-5700
jtorres@winston.com
dbarella@winston.com

## **CERTIFICATE OF SERVICE**

The undersigned, one of the attorneys for Defendants, hereby certifies that he has caused a true and correct copy of the foregoing to be served upon the following counsel of record:

Stuart M. Israel
John G. Adam
Legghio & Israel, P.C.
306 South Washington, Suite 600
Royal Oak, Michigan 48067
israel @legghioisrael.com
jga@legghioisrael.com

Antonia Domingo
Assistant General Counsel
United Steel, Paper and Forestry, Rubber,
Manufacturing, Energy, Allied Industrial
and Service Workers International Union,
AFL-CIO-CLC
60 Blvd. of the Allies, 8th Floor
Pittsburgh, Pennsylvania 15222

Stephen A. Yokich
Dowd, Bloch, Bennett, Cervone,
Auerbach & Yokich
8 S. Michigan Ave., 19th Floor
Chicago, Illinois 60603
syokich@laboradvocates.com

via electronic mail and by Federal Express, priority overnight, this 15th day of March, 2018.

                                         /s/ Derek G. Barella
                                               Derek G. Barella